IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA, *ex rel.*,
Paul R. Black,

       Plaintiff/Relator,

           v.

HEALTH & HOSPITAL CORPORATION
OF MARION COUNTY,

       Defendant.

\*      \*

         Civil Action No.: RDB-08-0390

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM OPINION**

This false claims action arises out of the Amended Complaint submitted by Relator Paul R. Black on behalf of the United States under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* This is the second such action that Relator has filed against the Defendant Health & Hospital Corporation of Marion County, Indiana ("HHC"). In October, 2003, Relator filed his first False Claims Act complaint against HHC in United States District Court for the Southern District of Indiana. On September 10, 2004, Relator filed an Amended Complaint in that case. After the United States declined to intervene, Relator voluntarily dismissed that action without prejudice. Over three years later, and only after finding new counsel,[1] Relator filed this second action in this Court in February, 2008.[2] The United States again declined to intervene, and Relator again filed an Amended Complaint on August 23, 2010.

---

[1] Relator candidly states that it took him several years to find counsel willing to re-file his case. *See* Relator's Opp'n at 21, ECF No. 34.

[2] This Court has jurisdiction over this matter pursuant to 31 U.S.C. §§ 3730 and 3732(a), and 28 U.S.C. § 1331 because Relator's claims constitute a federal question arising under the False Claims Act.

Currently pending before this Court are two motions: (1) Defendant Health & Hospital Corporation of Marion County's Corrected Motion to Dismiss (ECF No. 30); and (2) Relator's Motion to Defer Potential Motion for Leave to Amend until Resolution of Motion to Dismiss (ECF No. 33). This Court has reviewed the parties' submissions and held a hearing on March 11, 2011 pursuant to Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendant's Motion to Dismiss (ECF No. 30) is GRANTED, Relator's Motion to Defer Potential Motion for Leave to Amend until Resolution of Motion to Dismiss (ECF No. 33) is DENIED, and this case is DISMISSED WITH PREJUDICE.

## I. Background

In ruling on a motion to dismiss, "[t]he factual allegations in the Plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, prohibits persons and entities from knowingly presenting false or fraudulent claims to the federal government for payment or approval. The FCA may be enforced through its *qui tam* provisions, which allow private individuals to initiate civil actions on behalf of the United States. *See* 31 U.S.C. § 3730(b). Once a private individual, called a "relator," files suit, the United States government investigates the relator's claim and chooses to either intervene in the action or allow the relator to proceed on his own. *See id.* at § 3730(b)(4). If the false claims action is successful, the relator receives a percentage of the action's proceeds. *Id.* § 3730(d).

Defendant HHC is an Indiana municipal corporation and political subdivision of the State of Indiana that operates, among other entities, nursing homes. Relator Paul R. Black, ("Relator"

or "Black") is an Indiana citizen and an attorney.[3] He alleges that HHC participated in a scheme whereby it fraudulently certified certain Medicaid expenditure documents in order to receive federal matching Medicaid funds to which it was not entitled.

Medicaid is a jointly funded state and federal program designed to finance health care for eligible individuals who are unable to afford medical care. *See* 42 U.S.C. § 1396 *et seq.* The Medicaid program was created in 1965, pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq. See Arkansas Dep't of Health and Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). Individual states are not required to participate in the Medicaid program, but all 50 states do. *Id.* The states and federal government share the Medicaid cost, with the federal government paying between 50% and 83% of the total cost. *Id.* The states have discretion in designing and implementing their individual Medicaid programs. *See* 42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10-430.16. The United States Court of Appeals for the Fourth Circuit has summarized:

> Medicaid is a cooperative federal-state program designed to partially compensate states for the costs of providing healthcare to needy individuals. 42 U.S.C. § 1396. States are not required to participate in the program, but if they choose to do so, "they must implement and operate Medicaid programs that comply with detailed federally mandated standards." *Antrican v. Odom,* 290 F.3d 178, 183 n. 2 (4th Cir. 2002). To qualify for federal assistance, a state must submit a comprehensive plan to the federal Secretary of Health and Human Services describing the nature and scope of the state's Medicaid program. 42 C.F.R. § 430.10.

*Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 206-07 (4th Cir. 2007). The agency responsible for administering the Medicaid program and approving the state Medicaid plans is

---

[3] Relator Black has been counsel of record in several health care lawsuits, and in particular, represented a relator whose claims were dismissed under the Public Disclosure Bar, an issue central to the present case. *See, e.g.*, *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009) (dismissed under Public Disclosure Bar); *Ind. Ass'n of Homes for the Aging, Inc. v. Ind. Office of Medicaid Policy and Planning*, 60 F.3d 262 (7th Cir. 1995); *Ind. St. Bd. of Public Welfare v. Tioga Pines Living Ctr., Inc.*, 622 N.E. 2d 935 (Ind. 1993).

the Centers for Medicare and Medicaid Services ("CMS").  *See U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 342 n.4 (4th Cir. 2009).  Once CMS approves a state plan, the state is entitled to receive federal reimbursement for "an amount equal to the Federal medical assistance percentage . . . of the total amount expended . . . as medical assistance under the State plan."  42 U.S.C. § 1396b(a)(1).  This federal reimbursement is known as the Federal Medical Assistance Percentage ("FMAP" or "Federal Match").

There are three Medicaid funding mechanisms relevant to this action.  In an effort to promote efficiency and economy, the government caps the amount of money a state may pay to medical providers through Upper Payment Limit ("UPL") regulations.  *See* 66 Fed. Reg. 3148 (2001).  These UPL regulations allow states to reimburse hospitals, nursing homes, and other providers for uncompensated care, but limit that reimbursement to an amount equal to the payment the Medicare Program would have paid for the same service.  *See* 42 C.F.R. § 447.272. An intergovernmental transfer ("IGT") is a mechanism through which states fund their share of Medicaid expenses by transferring money from local public entities to the state.  Such transfers are sanctioned by the Medicare Act, 66 Fed. Reg. at 3148, and have been approved by Congress. *See Alameda Cnty. Medical Ctr. v. Leavitt*, 559 F. Supp. 2d 1, 2 (D.D.C. 2008) ("Congress gave its explicit imprimatur to this system in 2000").  In addition to transferring funds between local and state entities, Medicaid providers may also make direct Medicaid expenditures that qualify for Federal Matching funds, so long as those expenditures are certified with CMS.  Those certifications are known as Certified Public Expenditures ("CPEs").

Despite Congressional acquiescence, the UPL and IGT Medicaid financing mechanisms are not without their critics.  Indeed, after recognizing perceived abuses of the system by states to increase Federal Match spending, the Office of the Inspector General and the General

Accounting Office ("GAO") conducted audits in 2001 that revealed, at a minimum, the potential for abuse of the system. *See* 66 Fed. Reg. at 3148. In response, CMS revised the UPL regulations to reduce the amount of payments that could be made using the UPL/IGT mechanism. *Id.* These revisions reduced, but did not eliminate the states' ability to manipulate UPL/IGT mechanisms in order to generate additional Federal Match funding. Specifically, the regulations set upper payment limits on overall aggregate payments to all Medicaid providers, but maintained separate UPLs for state government-owned and non-state government-owned entities. As a result of this aggregate, and not provider-specific, scheme it is possible for a particular Medicaid provider to receive an amount in excess of the UPL (hereinafter referred to as "UPL Gap") for that class of provider, so long as the total payments to the aggregate class of providers does not exceed the UPL.

CMS has repeatedly expressed its concern with the UPL/IGT financing scheme utilized by states to take advantage of the UPL Gap, and in 2007 sought to issue a new regulation that would have significantly curtailed the states' use of the mechanism. *See* 72 Fed. Reg. 2236 (2007) (the "2007 Proposed Rule"). The preamble of the 2007 Proposed Rule provides a relatively concise summary of CMS' concerns regarding IGTs and the UPL Gap:

> We note that currently there are a variety of practices used by State and local governments in submitting a CPE as the basis of matching FFP for the provision of Medicaid services. Different practices often make it difficult to (1) align claimed expenditures with specific services covered under the State plan or identifiable administrative activities; (2) properly identify the actual cost to the governmental entity of providing services to Medicaid recipients or performing administrative activities; and (3) audit and review Medicaid claims to ensure that Medicaid payments are appropriately made. Further, we find that in many instances State Medicaid agencies do not currently review the CPE submitted by another unit of government to confirm that the CPE properly reflects the actual expenditure by the unit of government for providing Medicaid services or performing administrative activities.

72 Fed. Reg. at 2239.

However, the 2007 Proposed Rule remained just that—proposed, and was never adopted. Indeed, Congress held hearings and subsequently enacted a moratorium on the issuance of the 2007 Proposed Rule and similar rules like it. *See* U.S. Troop Readiness, Veterans Care, Katrina Recovery and Iraq Accountability Appropriations Act of 2007, Pub. L. No. 110-28, § 7002(a), 121 Stat. 112, 187 (2007); *see also Alameda*, 559 F. Supp. 2d at 2 (summarizing the history of the congressional moratorium). Moreover, in 2009, Congress further signaled its discontent with CMS' proposed regulations and included a provision in the American Recovery and Reinvestment Act of 2009 that discouraged CMS from proposing similar regulations. *See* Pub. L. No. 111-5, 123 Stat. 115, 507.

Despite the proposed and unapproved nature of the 2007 CMS regulations, Relator's allegations regarding Indiana and Defendant HHC's UPL/IGT practices closely track the concerns articulated by CMS that prompted it to propose the regulations in the first place. In essence, Relator alleges that HHC made false certifications to Indiana's Office of Medicaid Policy and Planning ("OMPP") in order to claim Federal Match funding to which it was not entitled. *See* Am. Compl. ¶¶ 63-65, 103, 110, 122, 131, 182, 189-201. Ex. E, ECF No. 21. To bolster his claim, Relator points to four documents that he alleges evidence HHC's fraud. *See* Black Decl. at 3-4, ECF No. 34-3. In addition, Relator relies on a 2009 HHC Annual Report that purports to show "profit" earned by HHC in the form of Medicaid Special Revenue. *See* Relator's Opp'n at 1-2, ECF No. 34. Relator argues that because Medicaid requires Federal Match funding be available only for actual medical expenditures made on behalf of eligible Medicaid recipients, then any "profit" from such payments must be the result of a false certification by HHC. In essence, Relator argues that Indiana and HHC, through a "secret" Medicaid State Plan, arranged fictitious IGTs or certifications that allowed HHC to claim Federal

Match funding in excess of any funds actually used for eligible Medicaid recipients. Relator argues that because it is impossible for HHC to realize any "profit" on Federal Match funding, the certification forms submitted by HHC claiming Federal Match funding necessarily contained false statements, thereby defrauding federal taxpayers of many millions of dollars. At base, Relator's allegations amount to a dissatisfaction with Indiana and HHC's use of accounting procedures that seek to maximize the Federal Match Medicaid funding.

However, contrary to the "secretive," "fictional," and "sham" transactions, alleged by Relator, the procedures and agreement between the State of Indiana and HHC have been reviewed and approved by CMS multiple times. As a preliminary matter, it should be noted that Indiana law mandates that the State use financing mechanisms such as IGTs to maximize Federal Match Medicaid funding. The Indiana Code states that: "Each governmental transfer or other payment mechanism that the office implements under this chapter must maximize the amount of federal financial participation that the state can obtain through the intergovernmental transfer or other payment mechanism." Ind. Code § 12-15-14-1(b). In effect, the law of the State of Indiana commands Medicaid providers to leverage IGTs and other Medicaid financing mechanisms in such a way as to take full advantage of the UPL Gap. In 2001, CMS reviewed and approved Indiana's State Plan Amendment ("SPA"), which explicitly sought to generate Federal Match funding through the UPL Gap. *See* Compl. at Ex.C, p. 48(a), ECF No. 1-3. The Office of the Inspector General conducted an audit of Indiana's Medicaid UPL transactions, and in 2005 concluded that "Indiana calculated the UPL for non-State government nursing homes in accordance with Federal regulations and the approved State plan amendment." *See* HHC's Mot. to Dismiss at 13, ECF No. 30; HHS OIG Review of Indiana's Medicaid Upper Payment Limits for State Fiscal Years 2001 and 2001, A-05-03-0068 (Sept. 28, 2005), ECF No. 30-9.

Furthermore, in 2007, CMS reapproved Indiana's SPA. *See* HHC's Mot. to Dismiss at Ex.6, ECF No. 30-8.

Relator asserts four causes of action in his Amended Complaint. Count I alleges that Defendant HHC caused state Medicaid agencies to submit factually false claims to CMS, in violation of 31 U.S.C. § 3729(a)(1) of the False Claims Act. Am. Compl. at ¶¶ 231-34. Count II alleges that HHC caused state Medicaid agencies to submit legally false claims to CMS, in violation of 31 U.S.C. § 3729(a)(1) of the FCA. *Id.* at ¶¶ 235-38. Count III alleges that HHC "made and used, and caused to be made and used, false records and statements to get false or fraudulent claims paid or approved by the United States" in violation of 31 U.S.C. § 3729(a)(2) of the FCA. Count IV alleges that HHC entered into a conspiracy to defraud the United States in violation of 31 U.S.C. § 3729(a)(3). HHC has moved to dismiss Relator's *qui tam* action on the grounds that the action is barred pursuant to the Public Disclosure Bar, that it does not comply with the particularity requirement set forth in Federal Rule of Civil Procedure 9(b), that it fails to state a claim for relief under Rule 12(b)(6), and that venue is improper. This Court concludes that this action must be dismissed pursuant to the Public Disclosure bar and Rules 9(b) and 12(b)(6). This Court need not address HHC's venue argument.

## II. Jurisdiction—The Public Disclosure Bar

Defendant HHC has moved to dismiss Black's four claims on the basis that this Court lacks subject matter jurisdiction under the False Claims Act. Specifically, HHC argues that Relator's claims are barred under the Public Disclosure Bar, 31 U.S.C. § 3730(e)(4)(A), because they are based on public disclosures and Relator cannot establish that he is an "original source" of the information. Under Rule 12(b)(1), it is Relator Black who must prove that subject matter jurisdiction exists. *See U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing

*Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  When jurisdictional facts are disputed, a presumption of truthfulness does not attach to the Plaintiff's allegations, and the court is permitted to consider extrinsic evidence.  *Id.* at 348.

The purpose behind the Public Disclosure Bar "is to avert 'parasitic' actions by *qui tam* relators, which, 'rather than bringing to light independently-discovered information of fraud, simply feed off of previous disclosures of government fraud.'"  *U.S. ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 636 (E.D. Va. 2010) (quoting *U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994)).  Stated another way, the aim of the Public Disclosure Bar is to "discourage[] [ ] opportunistic plaintiffs who have no significant information to contribute on their own."  *U.S. ex rel. Wilson v. Graham Cnty. Soil & Water Conserv. Dist.*, 528 F.3d 292, 299 (4th Cir. 2008) (citing *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)).

From 1986 until March, 2010, The False Claims Act contained the following restriction on subject matter jurisdiction for claims "based upon" public disclosures:

> (A)  No Court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a Congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B)  For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4) (pre March, 2010).  The United States Court of Appeals for the Fourth Circuit employed a strict reading of the "based upon" language, effectively requiring that subject matter jurisdiction be stripped only if the relator "actually derive[d]" his claims from a public

disclosure.  *U.S. ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1348 (4th Cir. 1994). The "actually derived" analysis employed by the Fourth Circuit is a narrower approach than that taken by all the other circuit courts.  *See U.S. ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 57 (1st Cir. 2009) ("the Fourth Circuit [is] alone among the courts of appeals in favoring a narrow reading of the 'based upon' language").  Under the broader approach taken by circuits other than the Fourth, "a *qui tam* suit is 'based upon' a public disclosure whenever the allegations in the suit and in the disclosure are the same, 'regardless of where the relator obtained his information.'"  *Lopez*, 698 F. Supp. 2d at 636 n.3 (quoting *Wilson*, 528 F.3d at 299).

In March, 2010, a new version of the Public Disclosure Bar became effective.  Those amendments adopted the broader majority view, and state: "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if *substantially the same* allegations or transactions as alleged in the action or claim were publicly disclosed . . . .  31 U.S.C § 3730(e)(4) (2010) (emphasis added).  The Supreme Court of the United States has held that the March, 2010 amendments are not retroactive.  *See Graham County Soil & Water Conserv. Dist. v. U.S. ex rel. Wilson*, __ U.S. __, 130 S. Ct. 1396, 1400 & n.1 (2010).  Accordingly, to the extent that Relator Black's allegations of false claims arose prior to March, 2010, this Court will employ the narrower Fourth Circuit test.  Regardless, Relator cannot meet his burden.

Under Section 3730(e)(4), a court lacks subject matter jurisdiction over an action if (1) there was a public disclosure; (2) the relator's action is "based upon" this public disclosure; and (3) the relator is not an "original source" of the information.  *See U.S. ex rel. Wilson v. Graham Cnty. Soil & Water Conserv. Dist.*, 528 F.3d 292, 299 (4th Cir. 2008) (overruled on other grounds, __ U.S. __, 130 S. Ct. 1396 (2010)).

In order to trigger the Public Disclosure Bar, "a disclosure need not specifically show fraud, but must merely be 'sufficient to put the government on notice of the likelihood of fraudulent activity.'" *U.S. ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 641 (E.D. Va. 2010) (quoting *U.S. ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 389 (6th Cir. 2005)). Moreover, a public disclosure need not name a particular defendant, although "the specificity of a disclosure as to a particular defendant is certainly material in determining whether there has been a public disclosure of the 'critical elements' of a relator's allegations." *U.S. ex rel. Lopez*, 698 F. Supp. 2d at 641.

In considering whether there was a public disclosure of the allegedly fraudulent scheme complained of by Relator, Defendant HHC notes the numerous GAO reports and audits, congressional hearings, and CMS statements regarding the states' use of IGT and UPL Medicaid financing mechanisms. *See* HHC's Mot. to Dismiss at 18-20, ECF No. 30. Under the False Claims Act, "federal administrative reports, audits or investigations qualify as public disclosures." *Wilson*, 528 F.3d at 301. As previously mentioned, CMS, the agency charged with administering the Medicaid program, has publicly expressed its concern with the individual states' use of UPL and IGT financing mechanisms to leverage Federal Match funding from at least as early as 2000. As a result, CMS and the GAO engaged in a lengthy and systematic review of the state Medicaid financing programs. As part of this review, the CMS Administrator specifically noted that Indiana was among seven states that "have worked cooperatively with [CMS] to either remove new recycling features or terminate existing recycling provisions in the future." HHC's Mot. to Dismiss at 19-20, Ex. 15, Ex. 12, ECF Nos. 30, 30-17, 30-14. While these disclosure did not specifically identify the Defendant HHC, they clearly show that the government was aware of the Medicaid financing schemes being utilized by the states in general,

and Indiana in particular, and are "sufficient to put the government on notice of the likelihood of related fraudulent activity" in Indiana and HHC's Medicaid transactions. As such, these reports fall squarely within the Public Disclosure Bar's definition of public disclosures.

Next, under the earlier, more narrow, Fourth Circuit standard, this Court must determine if Relator's allegations are "based upon" the public disclosures that were made. The Public Disclosure Bar will strip this Court of jurisdiction even if Relator's claims are "even partly based upon prior public disclosures." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 351-52 (4th Cir. 2009) (citations omitted); *see also U.S. ex rel. Ackley v. Int'l Business Machines Corp.*, 76 F. Supp. 2d 654, 658 (D. Md. 1999).

In making this determination, it is useful to consider the underlying statutory requirements that Relator must allege in order to establish a false claim action. Relator's claims arise under three subsections of the False Claims Act. These subsections impose liability on any person who (1) "knowingly presents, or causes to be presented, to [the Government] a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1); (2) "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," *id.* § 3729(a)(2); or (3) "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid," *id.* § 3729(a)(3). The Supreme Court, in *Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662 (2008), recently clarified the levels of proof required under each subsection. Section 3729(a)(1) "requires a plaintiff to prove that the defendant 'present[ed]' a false or fraudulent claim to the Government. *Id.* at 671. Subsection (a)(2) requires proof "that the defendant made a false record or statement for the purpose of getting a 'false or fraudulent claim paid by the Government.'" *Id.* Under subsection (a)(3), "it must be shown that the conspirators intended 'to defraud the Government.'" *Id.* Where, as here,

"the conduct that the conspirators are alleged to have agreed upon involved the making of a false record or statement, it must be shown that the conspirators had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." *Id.* Moreover "it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Id.*

When Relator's allegations are viewed through the lens of the proof necessary for Relator to make his False Claims Act allegations, it is clear that he personally is not the source of the information undergirding his claims, and that his claims are, at least in large part, "based upon" the public disclosures previously mentioned. His allegations largely mimic the public criticism of the UPL/IGT Medicaid financing mechanisms that have been the subject of great debate within CMS, Congress, the GAO, and elsewhere since at least as early as 2000. With regard to his allegations under Section 3729(a)(1) of the FCA, Black possesses no facts which would enable him to prove that HHC presented a false claim to the government. Similarly, under subsection (a)(2), he possesses no facts proving that HHC made a false record or statement for the purpose of getting a false or fraudulent claim paid by the government. Finally, under subsection (a)(3), Relator alleges no facts purporting to show any conspiracy involving HHC to defraud the government. All this begs the simple question; where, if not from the public disclosures, did Relator get the information underpinning his allegations?

In endeavoring to answer this question, HHC aptly points out that the timing of Relator's allegations neatly correspond to the increasing public debate regarding the UPL/IGT financing mechanism. In Relator's original complaint, filed in Indiana in 2003, his allegations centered around the theory that HHC violated federal anti-kickback statutes in its acquisition of various nursing homes. *See* Black Decl. ¶ 12, ECF No. 34-3; *see also* Indiana Compl. ¶ 1, ECF No. 30-

18. Approximately one year later, Relator filed an amended complaint in that action. In that amended complaint, Relator alleged that HHC's use of IGT transactions were prohibited "provider-related donation[s]" and involved false statements to CMS. HHC's Mot. to Dismiss, Ex. 17. Finally, in 2008, Relator filed this current action alleging violations of the FCA through HHC's false certifications and improper use of the UPL/IGT financing mechanism. As previously stated, Relator's current claims essentially parrot CMS's concerns regarding states' use of the UPL/IGT financing mechanism. Specifically, many of Relator's concerns with Indiana and HHC's Medicaid transactions are substantially similar to CMS's 2007 Proposed Rule that was subject to the congressional moratorium. *See* HHC's Mot. to Dismiss at 22 (comparing Black's Amended Complaint with sections of the 2007 Proposed Rule and noting numerous similarities), ECF No. 30. Moreover, in a telling admission, Black, in his declaration that was attached to his opposition to HHC's Motion to Dismiss, essentially acknowledges that he relied upon the 2007 Proposed Rule in crafting his Complaint. Specifically, he stated:

> Before filing my initial complaint in this Court, I reviewed the 2007 CMS proposal to adopt new regulations related to IGTs, CPEs, and UPL financing arrangements. Those regulations did not add anything to my knowledge about what Indiana and HHC were doing. But the proposed regulations helped me better articulate how the law applied to those facts. My 2004 First Amended Complaint had stated the same legal theories, but less directly and artfully.

Black Decl. at 7, ECF No. 34-3.

The various HHS-OIG and GAO audit reports demonstrate that the issues complained of by Relator were publicly disclosed. In particular, the 2007 Proposed Rule, which was published in the Federal Register but never became effective, concisely detailed CMS' concerns with the UPL/IGT financing mechanisms. Relator's statement that those regulations added nothing to his knowledge about Indiana and HHC's Medicaid agreement is simply not plausible. His complaint tracks the public debate surrounding the issue, and borrows heavily from CMS' publicly

disclosed concerns with the UPL/IGT program. Relator's claims are clearly "based upon" the public disclosures and add nothing to the ongoing policy debate surrounding the states' use of UPL/IGT Medicaid financing.

If the Relator's allegations are even partly based on a public disclosure, this Court must next determine whether Relator is nonetheless an "original source" of the information on which the allegations are based, and if he qualifies as an "original source," then the Public Disclosure Bar will not divest this Court of jurisdiction. *See U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 352 (4th Cir. 2009) (citations omitted). Under the pre-March, 2010 Public Disclosure Bar statute, a Relator is an "original source" if he has "direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government." 31 U.S.C. § 3730(e)(4)(B). Importantly, the Supreme Court has held that the term "allegations" comprises not only the claims made in the original complaint, but also those made in any amended complaint. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007). To meet his burden, Relator must "allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." *U.S. ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir. 1999). As this Court has noted: "[t]he Fourth Circuit has clarified that a relator's knowledge is direct if he acquired it through his own efforts, without an intervening agency, and it is independent if the knowledge is not dependent on public disclosures." *U.S. ex rel. Dugan v. ADT Security Services, Inc.*, No. DKC-03-3485, 2009 WL 3232080, at *14 (D. Md. Sept. 29, 2009) (quoting *Grayson v. Advanced Mgmt. Tech.*, 221 F.3d 580, 583 (4th Cir. 2000) (internal quotation marks and citation omitted).

A cursory review of Relator's original Complaint, Amended Complaint, and Declaration reveal that he is not an original source of his allegations. With respect to his Section 3729(a)(1) False Claims Act allegations, there is absolutely no evidence that could lead this Court to conclude that Relator had any direct and independent knowledge that the Defendant in this case had ever presented or caused to be presented a false or fraudulent claim to the government. Similarly, with respect to his Section 3729(a)(2) and (a)(3) claims, Relator provides no evidence that he had direct and independent knowledge that HHC actually made a false record or statement for the purpose of getting a claim paid or approved by the government, 31 U.S.C. 3729(a)(2), or that HHC conspired to make a false record or statement with the purpose of having a material effect in bringing about the government's payment of a false or fraudulent claim, *id.* at § 3729(a)(3); *see also Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 671 (2008). In fact, in his original Complaint, Relator essentially acknowledged his lack of direct and independent knowledge:

> [Relator] does not now have—and has not in the past had—access to all the books and records of Defendants that may be relevant to this action. He also does not have access to all relevant records of the Government or of the State of Indiana nor of its agencies, including OMPP. Mr. Black is therefore not in a position to identify, in all cases, all the specific documents used to make the false or fraudulent claims—or the false records and statements—described in this Complaint.

Compl. at ¶ 24, ECF No. 1.

Moreover, in his Declaration, Relator further reveals his lack of "original source" status, and that he cannot possibly show "exactly how and when he [ ] obtained direct and independent knowledge of the fraudulent acts alleged in the complaint." *U.S. ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162 (10th Cir. 1999). Rather than "support[ing] [his] allegations with competent proof," *id.*, Relator relies on inference and guesswork: "I knew in my

gut that HHC's UPL deal with the State was illegal, although Mr. Decker did not indicate that he believed it was illegal." Black Decl. at ¶ 12, ECF No. 34-3. This statement by Relator strikes at the heart of the purpose behind the Public Disclosure Bar. As the United States District Court for the Eastern District of Virginia succinctly stated in a similar context:

> By that standard, a complainant might well win relator status merely by communicating to the government, "I think something fishy is going on in connection with Government Contract A and Contractor B," and then relying on the evidence of fraud, if any, disclosed by a subsequent government investigation. Jurisdiction under § 3730 simply cannot be founded on so slender a reed. Indeed, such a standard invites the very type of parasitic, opportunistic lawsuit Congress sought to preclude when it first enacted a jurisdictional bar based on publicly disclosed information.

*U.S. ex rel. Detrick v. Daniel F. Young, Inc.*, 909 F. Supp. 1010, 1021-22 (E.D. Va. 1995). Here, it is clear that Relator's "mere suspicion that there must be a false or fraudulent claim lurking around somewhere simply does not carry his burden of proving that he is entitled to original source status." *Vuyyuru*, 555 F.3d at 353.

Finally, it should be noted that Relator has requested a period of jurisdictional discovery through which he hopes to elicit facts that would avoid dismissal of this action under the Public Disclosure Bar. Specifically, he requests the opportunity to seek discovery with regard to "all of HHC and Indiana's responses to governmental inquiries about its nursing home UPL expenditures and IGTs and CPEs related to those alleged expenditures." Relator's Opp'n at 18, ECF No. 34. The nature of the discovery requested by Relator, demonstrates that he is not entitled to it. Nothing in his request would shed any light on his status as an "original source" or whether his allegations are "based upon" any public disclosures. As such, Relator's jurisdictional discovery request is not, in fact, jurisdictional, and must be denied. *See Vuyyuru*, 555 F.3d at 348, 355 (affirming denial of jurisdictional discovery when the discovery requested

would not be relevant in establishing the jurisdictional facts relator must prove to avoid dismissal).

At base, "[t]he public disclosure bar is . . . chiefly designed to separate the opportunistic relator from the relator who has genuine, useful information that the government lacks." *U.S. ex rel. Lopez v. Strayer Educ., Inc.*, 698 F. Supp. 2d 633, 644 (E.D. Va. 2010) (quoting *In re Nat. Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 961 (10th Cir. 2009). Here, Relator possesses no useful information that the government lacks and falls well short of meeting his "burden of proving that the allegations underpinning his FCA claims were not 'based upon' [a public disclosure]. *See U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009). Therefore, this Court lacks subject matter jurisdiction over this case and Black's claims must be dismissed.

### III. Failure to State a Claim

In addition to arguing for dismissal based on this Court's lack of subject matter jurisdiction, Defendant HHC asserts that Relator failed to satisfy the pleading standards mandated by Federal Rules of Civil Procedure 8(a) and 9(b). Because this Court concludes that it lacks subject matter jurisdiction over this action pursuant to the Public Disclosure Bar, it need not address this argument. However, even if the Public Disclosure Bar did not strip this Court of jurisdiction, this case nevertheless warrants dismissal because the Amended Complaint fails to state a claim upon which relief may be granted.

### A. Rule 12(b)(6) Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim

upon which relief can be granted; therefore, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Simmons v. United Mort. and Loan Inv., LLC*, __ F.3d __, 2011 WL 184356, at *10 (4th Cir. Jan. 21, 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, a court considering a motion to dismiss "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Well-pleaded factual allegations contained in the complaint are assumed to be true "even if [they are] doubtful in fact," but legal conclusions are not entitled to judicial deference. *See Twombly*, 550 U.S. at 570 (stating that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'") (citations omitted). Thus, even though Rule 8(a)(2) "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

To survive a Rule 12(b)(6) motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Supreme Court has explained that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 129 S. Ct. at 1949. The plausibility standard requires that the pleader show more than a sheer possibility of success, although it does not impose a "probability requirement."

*Twombly*, 550 U.S. at 556.  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1937.  Thus, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief.  *Id.*

## B.  Rule 9(b) Standard of Review

A false claim allegation is an averment of fraud.  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999).  Therefore, a complaint alleging false claims must comply with the heightened standard of Federal Rule of Civil Procedure 9(b), which requires a pleader to "state with particularity circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The United States Court of Appeals for the Fourth Circuit has held that "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" are the circumstances that must be pled with particularity.  *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison*, 176 F.3d at 784).  This set of information is often referred to as the "who, what, when, where, and how" of the alleged fraud.  *Wilson*, 525 F.3d at 379 (internal quotation marks omitted).  For example, a complaint is insufficient if it fails to allege specific claims submitted to the government and the dates on which those claims were submitted.  *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002); *U.S. ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522, 526-27 (D. Md. 2006).  Moreover, as to the "what" requirement, "a plaintiff must show a link between allegedly wrongful conduct and a claim for payment actually submitted to the government."  *U.S. ex rel. Dugan v. ADT Security Services, Inc.*, No. DKC-03-3485, 2009 WL 3232080, at *14 (D. Md. Sept. 29, 2009) (citing

*U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (which notes that Rule 9(b) "does not permit a False Claims Act Plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.")). By requiring a plaintiff to plead circumstances of fraud with particularity and not by way of general allegations, Rule 9(b) screens "fraud actions in which all the facts are learned through discovery after the complaint is filed." *Harrison*, 176 F.3d at 789 (citation omitted).

## C. Analysis

### i. Relator Fails to State a Claim Under the False Claims Act

In pertinent part, the FCA prohibits (1) knowingly presenting a false or fraudulent claim for payment or approval, *see* 31 U.S.C. § 3729(a)(1); (2) knowingly using a false record or statement to induce the government to pay or approve a false or fraudulent claim, *see* 31 U.S.C. § 3729(a)(2); and (3) conspiring to induce the government to pay or approve a false or fraudulent claim, *see* 31 U.S.C. § 3729(a)(3).

To state a claim under the FCA, a plaintiff must prove "(1) that the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct was material; and (4) the statement or conduct caused the government to pay out money or to forfeit money due." *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 913 (4th Cir. 2003). Here, Relator Black has failed to plead factual allegations that "raise a right to relief above the speculative level" required under Rule 8(a)(2), *Twombly*, 550 U.S. at 555, let alone facts

constituting the "who, what, when, where, and how" of the alleged fraud as required under Rule 9(b), *Wilson*, 525 F.3d at 379.

Breifly stated, Relator's various claims and allegations boil down to the following argument: In 2002, HHC certified that certain HHC expenditures were eligible for Federal Match Medicaid funding. An Indiana nursing home summary sheet for fiscal quarters July 1, 2001, through December 31, 2002, documents "net gain" to the State of Indiana. Seven years later, in 2009, HHC's annual report documents "Medicaid special revenue" in the amount of $74,421,268, and nursing home "income [ ] before capital contributions and transfers" in the amount of $71,246,694. *See* Relator's Opp'n at 1-2, ex.1, ECF No. 34. Relator refers to HHC's "income [ ] before capital contributions and transfers" as "profit," and alleges this "profit" was the result of false certifications made by HHC to the State of Indiana. Relator argues that because Federal Match Medicaid funding may only be made for "actual" Medicaid expenses (and therefore must all go to patient care), any "profit" realized by HHC must be the result of false certifications. He claims that this "scheme" must have been in place from at least 2002 until 2009 in order to generate the "profit" realized by HHC in the form of Medicaid special revenue. However, he does not point to a single certification made by HHC between 2002 and 2009, but rather asserts only that "[i]t is reasonable to infer and allege that HHC has continued to make false certifications to OMPP every quarter since" October 2002. *Id.* at 40. In short, Relator's allegations rely completely on speculation and inference. In pleading his claims, Relator offers only formulaic recitations of statutory provisions, and provides not a single particularized fact to support the alleged fraud. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 129 S. Ct. at 1949.

Moreover, aside from failing to plead a plausible claim under Rule 8(a)(2), Relator's allegations do not even come close to satisfying the heightened standard of Federal Rule of Civil Procedure 9(b) which requires that a complaint alleging false claims must "state with particularity circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Relator's inadequate showing is not enough to satisfy Rule 9(b), and in the words of the Fourth Circuit, "if allowed to go forward, Relator's FCA claim would have to rest primarily on facts learned through the costly process of discovery. This is precisely what Rule 9(b) seeks to prevent." *Wilson*, 525 F.3d at 380 (citation omitted); *see also Harrison*, 176 F.3d at 789 ("The clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed); *U.S. ex rel. Goldstein v. Fabricare Draperies, Inc.*, 236 F. Supp. 2d 506, 508 (D. Md. 2002).

Although it hardly bears mentioning, this Court also notes that the essential argument underpinning Relator's allegations, *i.e.*, that any Federal Match "profit" received by HHC was fraudulently obtained because that funding must go to "actual" Medicaid expenditures, is legally incorrect. In a recent administrative action brought by Minnesota to challenge CMS' disallowance of Federal Match funding, the Department of Health and Human Services Departmental Appeals Board ("DAB") considered the issue and held:

> [C]ontrary to what CMS argues, Minnesota need not establish that the full amount of the State payments was actually used for the care of Medicaid recipients in the nursing homes. . . . [T]here was no requirement in place that actual costs be documented in order for payments to nursing homes to be allowable as medical assistance. Instead, the longstanding practice in Medicaid has been to permit states to reimburse providers using prospective rates that are estimates based on average historical costs of facilities in a particular class, without any requirement to retrospectively adjust to actual costs. *See* 41 Fed. Reg. 27,300, 27,303. . . . Thus, Minnesota was entitled to [Federal Match] in the State supplemental payments regardless of the precise amount that was expended for care of the Medicaid recipients in the nursing homes.

*In re Minn. Dep't of Human Servs.*, DAB 2157, Nos. A-07-53 & A-08-43, 2008 WL 656530, at HHS 13 (HHS Dep't Appeals Bd. March 4, 2008). As such, this Court believes that Relator has failed to plead even the most basic outlines of a FCA action, let alone the "who, what, when, where, and how" of the alleged fraud as required under Rule 9(b). *Wilson*, 525 F.3d at 379. In sum, setting aside the issue of the Public Disclosure Bar, this Court concludes that Relator has failed to state a claim and this action must be dismissed.

## IV. Relator's Motion to Defer Potential Motion for Leave to Amend until Resolution of Motion to Dismiss

On the same day he filed his opposition to HHC's Motion to Dismiss, Relator filed a Motion to Defer Potential Motion for Leave to Amend Until resolution of Motion to Dismiss (ECF No. 33). Because Local Rule 103.6 requires that a party seeking leave to amend provide the court a proposed copy of the amended complaint—something Relator has not done—Relator seeks to defer the period for him to move to amend until after this Court renders its decision on HHC's Motion to Dismiss. While perhaps not technically violative of Local Rule 103.6, this unusual request certainly runs afoul of its purpose, which is to "provide the district court with a means by which to determine whether the amendment would cure the defects in the initial complaint." *Francis v. Giacomelli*, 588 F.3d 186, 197 (4th Cir. 2009). Perhaps sensing the deficiencies in his already Amended Complaint, Relator essentially seeks a roadmap, namely a decision by this Court outlining those deficiencies, by which to cobble together a plausible and particularized set of allegations to file, yet again, another amended complaint. The Supreme Court, in *Forman v. Davis*, 371 U.S. 178, 182 (1962), held that "repeated failure to cure deficiencies by amendments previously allowed" and "futility of amendment" are sufficient reasons for denying a request for leave to amend. *See also Wilson*, 525 F.3d at 376 (holding that

the court has discretion to determine if further amendment would be futile and to dismiss with prejudice); *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (holding that dismissal with prejudice was warranted where "amendment would be futile in light of the [complaint's] fundamental deficiencies"); *Ganey v. PEC Solutions, Inc.*, 418 F.3d 379, 391 (4th Cir. 2005) (affirming a denial of leave to amend where any amendment would be futile).

Here, dismissal with prejudice is appropriate because Relator, now on the fourth iteration of his complaint, in the second U.S. District Court, and after the government has twice declined to intervene, fails to provide sufficiently particular allegations of Defendants' fraudulent activity. Relator's reliance on vague, conclusory assertions, and generic information regarding HHC and Indiana's Medicaid financing mechanisms shows that he cannot satisfy the pleading standards of the Federal Rules of Civil procedure. Therefore, Relator's Motion to Defer Potential Motion for Leave to Amend Until resolution of Motion to Dismiss is denied.

## CONCLUSION

For the reasons stated above, Defendant Health & Hospital Corporation of Marion County's Motion to Dismiss (ECF No. 30) is GRANTED, and this case is DISMISSED WITH PREJUDICE. Furthermore, Relator's Motion to Defer Potential Motion for Leave to Amend Until resolution of Motion to Dismiss (ECF No. 33) is DENIED.


A separate Order follows.



Dated:        March 28, 2011

                                                            /s/_____
                                                            Richard D. Bennett
                                                            United States District Judge